**Josephine MARRICONE**

v.

**UNITED STATES of America.**

Civ. A. No. 86–4218.

United States District Court,
E.D. Pennsylvania.

Jan. 12, 1989.

Kenneth M. Rodgers, Philadelphia, Pa., for plaintiff.

Melissa Satterwhite, Andrea W. McCarthy, U.S. Dept. of Justice, Torts Branch, Washington, D.C., for defendant.

### MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Plaintiff Josephine Marricone, Administratrix of the estate of her son, Anthony Marricone, Jr., pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2674, brought this non-jury action against defendant United States, in connection with the death of her son during his incarceration at the Federal Correctional Institute ("FCI") in Lexington, Kentucky. Plaintiff alleged that employees at FCI, a prison-hospital facility, failed to adequately diagnose and treat Mr. Marricone. Plain-

tiff set forth wrongful death and survival claims under both Pennsylvania and Kentucky law.

After reviewing the testimony presented at the bifurcated trial, the exhibits submitted by the parties, and the stipulation of facts agreed to by the parties, this Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

On March 1, 1985, at 12:30 p.m., Mr. Anthony Marricone self reported to the FCI at Lexington, Kentucky, to commence serving a three year term of imprisonment for conspiracy to commit theft from a foreign or interstate shipment. Execution of the sentence had been delayed on several occasions due to chronic ulcerations on Mr. Marricone's feet. At the time he reported to FCI, Mr. Marricone, a mildly obese, heavy smoker, suffered from poorly controlled diabetes, circulatory problems, arteriosclerosis, and emphysema. In addition, Mr. Marricone had several toes on his right foot amputated. He had no known history of heart disease.

At approximately 12:45 p.m., Ms. Denise Sheets, an Administrative Assistant in the Receiving and Discharge Area, processed Mr. Marricone into FCI. Ms. Sheets finger-printed Mr. Marricone who, during the procedure, neither voiced any complaints nor displayed any symptoms of illness.

At approximately 2:30 p.m., Mr. Marricone was interviewed by Physician's Assistant Anita Marlar, as part of a medical intake screening procedure. Section 522.20 (Purpose and Scope of Intake Screening) of the Federal prison system regulations require Bureau of Prison staff to screen newly arrived inmates to ensure that health, safety, and security standards are met, and states:

Prior to placement of an inmate into the institution's general population, staff shall ensure that health, safety and security standards delineated in this Program Statement are met. Medical and social interviews are required to meet these standards.

Furthermore, under Section 522.21 (Procedures of Intake Screening), the medical screening, to occur immediately after the inmate's arrival, is to be completed in accordance with Chapter 6400 of the Medical Manual. The pertinent section of Chapter 6400 of the medical manual of the Bureau of Prisons require at Section 6408 as follows:

*6408.* Physical Examinations–Inmate

1. Intake Screening-as newly committed inmates are received at institutions they will be given an initial overall inspection by a member of the medical staff to determine their needs for any urgent medical care ...

This intake screening procedure is not intended to be a full medical examination and involves no hands-on evaluation or treatment. Rather, the screening is designed to elicit a brief medical history from the inmate in order to determine whether there are special housing needs and to determine whether the inmate would be able to participate in temporary work assignments.

As part of the screening process, Mr. Marricone filled out a Report of Medical History form SF93. That form requests, in pertinent part, information from the inmate concerning certain symptoms or conditions which the person may have experienced in the past or may be presently experiencing. Specifically, the form, at section 11, states:

Have you ever had or have you now and then lists a number of different symptoms. Mr. Marricone indicated positive responses to the following conditions:

* Shortness of breath
* Pain or pressure in chest
* Chronic cough
* Cramps in your legs
* Frequent indigestion
* Sugar or albumin in urine
* Loss of finger or toe
* Foot trouble
* Neuritis

Mr. Marricone did not indicate a positive response to either of the following conditions: palpitation or pounding heart or heart trouble.

After Mr. Marricone completed the form, he was questioned by Ms. Marlar who did not have access to any medical records of Mr. Marricone gathered by the Probation Department with respect to Mr. Marricone. Item 25 of the Report of Medical History form SF93 states:

Physician shall comment on all positive answers in items 9 through 24.

However, it was Ms. Marlar's practice and custom to question inmates on all positive responses but to make annotations in Item 25 only when an inmate states that he or she is presently experiencing the symptom or condition. No notations appear at Item 25 concerning shortness of breath, pain or pressure in the chest, or chronic cough. Ms. Marlar did, however, make the following notations in Item 25 concerning Mr. Marricone:

Surg/Hosp.  –Amp. 2 toes (R) foot
–R–Leg By pass Femoral popliteal–1983
Corr. Surg., toes–1984

Based upon this medical intake screening, Ms. Marlar completed Form BP–Med–23 (Intake Screening–Medical) in which she recommended, due to Mr. Marricone's compromised ability to ambulate due to the aforementioned conditions, that he be assigned to a room on the first floor of Antaeus Unit with a lower bunk. This unit was used to house inmates who were older, or had a history of chronic disease or orthopedic problems requiring them to be within a short walking distance of the medical facilities at FCI.

Lieutenant William Coen was the correctional officer responsible for making the actual inmate rooming assignments on the Antaeus Unit. At the time that Mr. Marricone reported to him, there were no first floor rooms available on the Antaeus Unit. The only available rooms in Antaeus were on the second and third floors. The Antaeus Unit elevator was not working at that time. Lt. Coen, seeing that Mr. Marricone was walking with crutches, asked whether he could make it up the stairs to the third floor. Mr. Marricone, who at the time neither voiced any complaints nor displayed any symptoms of illness, replied that he could walk to the third floor. Mr.

Marricone was escorted to his cell by James Bryant, an inmate clerk.

At 4:30 p.m., a "count" of all inmates on the Antaeus Unit was performed. Such "counts" are an accounting of the whereabouts of all prisoners performed by two or more correctional officers at regular intervals. The 4:30 p.m. count requires that all inmates stand outside their cell doors and be counted. If an inmate fails to do so, the count will be incorrect and must be redone. Any recount performed is required to be noted in a log book maintained on the Unit. No such notation appears in the Antaeus logbook entries for March 1, 1985. The Court finds that there was insufficient evidence to support a finding that Mr. Marricone failed to appear for the 4:30 p.m. count.

Non-standup counts were also performed at 10:00 p.m., 12 midnight, and 3:00 a.m. Mr. Marricone neither requested help from nor complained of any illness to the correctional officers during any of these counts. During the course of the night, Mr. Marricone's cellmates—Lloyd Cutrufello, Roger Swift, and Edward King—observed Mr. Marricone perspiring, coughing, agitated, out of breath, and heard Mr. Marricone complain of chest pain.

At approximately 4:50 a.m. on March 2, 1985, an inmate alerted Correctional Officer Charles Brock, assigned to the Antaeus Unit, that Mr. Marricone appeared ill. Officer Brook immediately called the medical unit and spoke to John Sunde, the Physician's Assistant. Mr. Sunde, after examining Mr. Marricone's intake records, asked that Mr. Marricone be brought to the prison hospital immediately. At approximately 5:00 a.m., Officer Brock telephoned his supervisor, Lieutenant Richard Cole, and informed him that Mr. Sunde wanted to see Mr. Marricone. Lt. Cole went to Mr. Marricone's cell and asked him if he wanted to be transported to the prison hospital by wheelchair. Mr. Marricone declined, stating that he would be alright if he could just catch his breath. Mr. Marricone arrived at the prison hospital at approximately 5:05 a.m.

Mr. Sunde took the patient's vital signs, started him on oxygen and an IV, and obtained an EKG reading. Mr. Marricone stated that he had been feeling weak for eight days, experienced chest pains whenever he coughed, had not taken his diabetes medication for several days, and thought that he had the flu. At approximately 5:20 a.m., Dr. Timothy Barth, the prison physician, arrived at F-4. During Dr. Barth's examination of Mr. Marricone, Mr. Marricone denied chest pain at that time but commented that he had had chest pain with coughing during the past few days. Dr. Barth immediately contacted an ambulance to transport Mr. Marricone to St. Joseph's Hospital in Lexington, Kentucky.

At approximately 6:05 a.m., Mr. Marricone departed FCI by ambulance for St. Joseph's Hospital. Mr. Marricone arrived at the hospital at 6:18 a.m. where, after going into cardiac arrest, was pronounced dead at 6:48 a.m.

A post mortem examination of Mr. Marricone was performed by the Office of the Chief Medical Examiner in Louisville, Kentucky. The examination revealed a massive acute myocardial infarction which, in certain areas, was two to three days old, with additional more recent changes. The examination further revealed that Mr. Marricone suffered from coronary arteriosclerosis, severe, with thrombis of left anterior descending; a frequent complication of diabetes. The myocardial infarction occurred when a blood clot formed over a large placque which had already substantially blocked the left anterior descending artery of the heart, thereby completely obstructing the blood flow out of that artery.

Both parties' medical experts agreed that Mr. Marricone had suffered a myocardial infarction at least one to two days prior to his arrival at FCI. However, we find, based upon the testimony and supporting documentation, that plaintiff has failed to prove by a preponderance of the evidence that: (1) Ms. Marlar should have diagnosed Mr. Marricone's medical condition at the time of the intake screening; and (2) had Mr. Marricone's medical condition been diagnosed at the time of the intake screen-

ing, medical treatment available in March, 1985 could have prevented his death. We find that because Mr. Marricone, at no point prior to his reporting to Physician's Assistant John Sunde at 5:05 a.m. on March 2, 1985, either complained of or physically manifested any symptoms of his cardiac condition, Ms. Marlar could not reasonably have been expected to diagnose Mr. Marricone's condition. We further find that the preponderance of evidence does not support the conclusion of plaintiff's medical expert, to wit, that medical treatment available in March, 1985 could have prevented Mr. Marricone's death had he been referred to a hospital at the time of the intake screening.

## CONCLUSIONS OF LAW

The liability of the United States under the Federal Tort Claims Act is determined in accordance with the substantive law of the state where the acts or omissions complained of occurred. 28 U.S.C. § 1346(b); *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Inasmuch as both Mr. Marricone's death as well as the majority of conduct that is the subject of this case occurred in Kentucky, this Court previously ruled that the law of Kentucky governs the determination of liability. *Marricone v. United States*, No. 86-4218 (E.D.Pa. March 12, 1987) slip op. at 8 [1987 WL 7858].

Kentucky has adopted a doctrine of pure comparative negligence whereby "the trier of fact must consider both negligence and causation in arriving at the proportion that negligence and causation attributable to the claimant bears to the total negligence that was a substantial factor in causing the damages." *Hilen v. Hays*, 673 S.W.2d 713, 720 (Ky.1984); *see also Wemyss v. Coleman*, 729 S.W.2d 174, 177 (Ky.1987). In *Deutsch v. Shein*, 597 S.W.2d 141, 144-45 (Ky.1980), the Kentucky Supreme Court stated that negligent conduct is not a substantial factor if the harm would have been sustained even had the defendant not acted negligently. *See also Carlotta v. Warner*, 601 F.Supp. 749, 752 (E.D.Ky.1985).

Under Kentucky law, expert medical testimony is required in a malpractice case to

establish both that the treatment given or withheld was below the degree of care and skill expected of a reasonably competent practitioner and that the negligence was a substantial factor in causing the death or injury, unless both negligence and causation is so apparent that even a layman could recognize it. *Blair v. Eblen*, 461 S.W.2d 370, 372–73 (Ky.1970); *Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky.1982); *see also Jarboe v. Harting*, 397 S.W.2d 775, 778 (Ky.App.1965).

Based upon the trial record, we conclude first that plaintiff failed to meet her burden of proving by a preponderance of the evidence that any agent, servant or employee of defendant United States acted negligently in the diagnosis and/or treatment of Mr. Marricone. Specifically, plaintiff failed to prove by a preponderance of the evidence that Ms. Marlar was negligent in failing to detect and diagnose Mr. Marricone's cardiac condition during the medical intake screening. Given the lack of any physical manifestation of or complaint of current cardiac symptomology on the part of Mr. Marricone duirng the intake procedure, we conclude that plaintiff has not proven by a preponderance of evidence that Ms. Marlar's performance fell below the degree of care and skill required of a reasonably competent medical practitioner.

We further conclude that plaintiff failed to establish by a preponderance of evidence that Lt. William Coen was negligent in assigning Mr. Marricone to an upper bunk on the third floor of the Antaeus Unit. The only reason for the recommended assignment of Mr. Marricone to a first floor lower bunk was his compromised ability to ambulate. Given the lack of availability of such bunks, Mr. Marricone's assurance that he could walk to the third floor, and the lack of any physical manifestation or complaint of cardiac illness, we cannot conclude that Lt. Coen's action was negligent. Moreover, we conclude that the plaintiff failed to prove by a preponderance of evidence that any of the guards on the Antaeus Unit were negligent in failing to diagnose Mr. Marricone's physical condition prior to 4:50 a.m. given the fact that neither Mr. Marricone nor any other cellmates on the Antaeus Unit requested help nor, in any way, complained of Mr. Marricone's illness prior to 4:50 a.m. Finally, we conclude that plaintiff has failed to prove by a preponderance of the evidence that Lt. Richard Cole was negligent in transporting Mr. Marricone from his cell to the prison hospital. The record indicates that Mr. Marricone was offered and refused a wheelchair; stating that he was capable of walking to the hospital facility.

Even assuming that plaintiff had proven negligence on the part of one or more agents, servants or employees of defendant United States, we conclude that plaintiff failed to prove by a preponderance of the evidence that such negligence was a substantial factor in causing Mr. Marricone's death. While recognizing the conflicting nature of the expert medical testimony, we conclude that plaintiff failed to prove by a preponderance of the evidence that medical intervention at the time of Mr. Marricone's arrival at FCI could have prevented his death. As Dr. Irving Herling testified, we conclude that even had Mr. Marricone been, at the time of his arrival at FCI, immediately transferred to a hospital, medical treatment available in March 1985, could not have prevented his death.

Thus, for the reasons stated, judgment will be entered in favor of defendant United States and against plaintiff Josephine Marricone.